Richard I. Werder, Jr.
Thomas D. Pease
David Mader
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Facsimile:  (212) 849-7100

Dominic Gentile
GENTILE CRISTALLI MILLER ARMENI
  & SAVARESE, PLLC
410 S. Rampart Blvd.
Suite 420
Las Vegas, Nevada 89145
Telephone: (702) 880-0000
Facsimile: (702) 778-9709

Attorneys for Plaintiffs International Game
Technology and IGT

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA, SOUTHERN DIVISION

INTERNATIONAL GAME TECHNOLOGY
and IGT,

               Plaintiffs,

      vs.

LEAP FORWARD GAMING, INC.,
MOHAMAD ALI SAFFARI, PERRY COBB,
AND BRUCE CUNNINGHAM,

            Defendants.

**COMPLAINT**

    1.     This is an action for damages and an injunction resulting from the unlawful misappropriation and improper use of Plaintiffs International Game Technology and IGT's valuable and secret computer code by its former employees and their current employer, Defendant Leap Forward Gaming, Inc. ("LFG").

    2.     Plaintiffs have spent years, and tens of millions of dollars, to develop a market-leading gaming system that allows casinos and other licensed gaming establishments to track player activity across different gaming cabinets and then project player information directly onto the screen of the cabinet at which the player is then playing.

3.     In recent years, Defendant LFG has begun to market competing devices to IGT's clients that LFG claims represent a revolution in the way that gaming systems, like those made by Plaintiffs, interact with each other across casino floors.  Yet Plaintiffs have recently discovered that fundamental aspects of LFG's competing technology have been copied directly—and without authorization—from Plaintiffs' secret and protected intellectual property.

4.     Defendants Mohamad Ali Saffari, Perry Cobb, and Bruce Cunningham (collectively the "Individual Defendants") each spent years at IGT, many of them assisting in the development of a proprietary technology used by casinos across Nevada, the United States, and the world to track player gaming activity.

5.     In 2009, on the very same day he left IGT, Defendant Saffari incorporated Defendant LFG.  Saffari later recruited Defendants Cobb and Cunningham after their respective departures from IGT.

6.     Exploiting the proprietary technical knowledge that the Individual Defendants had developed during their employment at IGT, LFG produced and is now marketing devices that compete directly with Plaintiffs' own products by physically attaching to existing IGT hardware and then circumventing Plaintiffs' proprietary encryption to access player data transmitted through that IGT hardware.

7.     Defendants' unlawful access to, and use of, confidential, encrypted player information has already drawn the attention of at least one state gaming regulator.  In addition to potential criminal and regulatory liability, Defendants' conduct has also directly injured Plaintiffs, giving rise to multiple claims for damages.

8.     *First*, LFG's unauthorized accessing of IGT's hardware violates both the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), and Nevada's state equivalent, N.R.S. 205.4765, which not only impose criminal liability but also provide civil remedies for damages.  LFG's unauthorized conduct also constitutes a common law trespass to chattel.

9.     *Second*, by exploiting their technical knowledge of Plaintiffs' technology to enable LFG to connect its competing devices to IGT's hardware, the Individual Defendants have violated

their express written contractual obligations not to compete with IGT or to use their knowledge of Plaintiffs' technology for the benefit of LFG (or anyone else).

10. *Third*, it has recently become apparent that LFG has *not* relied solely on the technical knowledge the Individual Defendants brought with them when they left IGT. Instead, a former LFG employee has alleged—***and Defendant Saffari has admitted***—that LFG is using Plaintiffs' secret, proprietary source code to gain access to the data on IGT's hardware by circumventing Plaintiffs' proprietary encryption technology. Defendant's unauthorized taking, possession, and use of Plaintiffs' valuable source code—which Plaintiffs take considerable effort to keep secret—constitutes misappropriation in violation of the Nevada Trade Secrets Act, N.R.S. 600A.

11. Additionally, because Plaintiffs keep the source code secret and provide access only to a subset of employees—a subset that included Defendant Cobb during his employment with IGT—it is apparent that a copy of the source code has been unlawfully taken or obtained by or for one or both of those Defendants in violation of the CFAA, its Nevada state equivalent, the common law of conversion, and their own express written contractual obligations to IGT.

12. *Fourth*, by taking Plaintiffs' proprietary source code, incorporating it into its own devices, and then marketing those devices under LFG's own name to Plaintiffs' customers, LFG is engaging in a "reverse passing off" of Plaintiffs' property in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a).

13. As a result of these many federal and state statutory, common law, and contractual violations, Plaintiffs have suffered considerable loss, including the loss of value resulting from the disclosure of their trade secrets, the costs they have incurred and continue to incur in responding to that disclosure, and the revenue they have lost and will continue to lose as long as LFG is permitted to compete with Plaintiffs by selling products that contain Plaintiffs' unlawfully misappropriated and copied source code.

14. Plaintiffs therefore bring this action seeking damages for the injury caused by Defendants' unlawful conduct, a permanent injunction barring Defendants from making any

1  further use of Plaintiffs' trade secrets, and costs and attorneys' fees as permitted by the parties'

2  contracts and by statute.

3

4  **PARTIES**

5  15.  Plaintiff International Game Technology is a Nevada corporation with its principal

6  place of business at 6355 S. Buffalo Drive, Las Vegas, Nevada.

7  16.  Plaintiff IGT is a Nevada corporation with its principal place of business at 6355 S.

8  Buffalo Drive, Las Vegas, Nevada.  IGT is a wholly owned subsidiary of Plaintiff International

9  Game Technology.  Hereinafter, and unless otherwise specified, "IGT" shall denote both

10  Plaintiffs, while "Subsidiary IGT" shall denote the wholly owned subsidiary of International

11  Game Technology referenced here.

12  17.  Defendant Leap Forward Gaming, Inc. is a Nevada corporation with its principle

13  place of business at 10589 Double R Boulevard, Reno, Nevada.

14  18.  Defendant Mohamad Ali Saffari is CEO of Leap Forward Gaming, Inc.  On

15  information and belief, Saffari is a resident of Nevada.

16  19.  Defendant Perry Cobb is an Engineering Manager at Leap Forward Gaming, Inc.

17  On information and belief, Cobb is a resident of Nevada.

18  20.  Defendant Bruce Cunningham is a Staff Electrical Engineer at Leap Forward

19  Gaming, Inc.  On information and belief, Cunningham is a resident of Nevada.

20

21  **JURISDICTION AND VENUE**

22  21.  This Court has jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331

23  and 1367 because IGT asserts causes of action arising under the laws of the United States

24  (including Chapter 22 of Title 15), as well as causes of action arising under the laws of the State of

25  Nevada that are so related to IGT's federal claims that they form part of the same case or

26  controversy.

27

28

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because all Defendants are resident in the State of Nevada and a substantial part of the events giving rise to IGT's claims occurred in this District.

## SUBSTANTIVE ALLEGATIONS

**IGT's Player-Tracking Technology**

23.     IGT is a world leader in the design, development, manufacture, distribution, and sale of computerized gaming equipment, software, and network systems.  Since the 1980s, a key aspect of IGT's business has been its computerized player-tracking technology, which allows casinos and other licensed gambling establishments to monitor player activity and reward player loyalty.

24.     IGT's player-tracking technology involves a system of proprietary hardware and software that is physically installed at a casino and other locations where gambling is permitted. Player activity data resides in a secure central server that is owned by the casino or gambling operator.  Running software that is installed and maintained by IGT, the server is physically connected by wire to computers called "BE2 Boards" that are installed in individual gaming cabinets.  When a player inserts his or her player card into a given cabinet, the BE2 Board retrieves that player's activity data from the casino's server, and then dynamically updates the player's data as he or she uses the cabinet.

25.     In addition to the BE2 Board, each gaming cabinet also contains an "sb NexGenII Board," which is physically connected to the BE2 board.  The sb NexGenII Board receives dynamically updated player data from the BE2 Board and projects the data onto the cabinet's display.

26.     To ensure the safety and security of player information, and to protect IGT's valuable and proprietary technology, all data transmitted between the server and the BE2 Board, and between the BE2 Board and the sb NexGenII Board, is encrypted using IGT's custom-coded and proprietary encryption program (the "Encryption Source Code").

27.     The Encryption Source Code is based on computer code first developed by Acres Gaming Inc., a Nevada corporation that IGT acquired in 2003.  In addition to its basic encryption

function, the Encryption Source Code contains a number of stylistic elements specifically designed to improve its strength, including a unique naming convention for the categories of transmitted information, a unique process for dividing individual transmittals into multiple "packets" of data that must be reassembled upon receipt, and a unique character string that is used to seed a random number generator used in the encryption and decryption process.

**IGT's Efforts to Protect the Secrecy of the Code**

28.     The Encryption Source Code is not generally available to IGT employees, let alone IGT's competitors or the public. Instead, the Encryption Source Code is kept in a Source Code Repository, a secure file management system at IGT.

29.     Employee access to the Source Code Repository is restricted to specific groups within IGT and is granted to specific employees within those groups on an as-needed basis. Once approved, an employee must log in to a company computer using his or her employee credentials in order to gain access to the Source Code Repository. If an employee has not been approved, his or her login credentials will not grant access to the Source Code Repository. Of IGT's approximately four thousand employees, only approximately three hundred have access to the Source Code Repository that contained the Encryption Source Code.

30.     In addition, every IGT employee is required to execute Subsidiary IGT's Invention and Secrecy Agreement, which provides in relevant part:

> EMPLOYEE, in consideration of his/her employment by [Subsidiary IGT], and other good and valuable consideration specified herein, agrees:
>
> (A) That during his/her employment term and thereafter he/she will hold in strictest confidence, and not disclose to any other person, firm, or corporation, without the express written authorization of an Officer of [Subsidiary IGT], any information, manufacturing technique, process, formula, development or experimental work, work in process, business, trade secret, or any other secret or confidential matter relating to the products, sales, or business of [Subsidiary IGT] or its affiliates or subsidiaries except as such disclosure or use may be required in connection with EMPLOYEE'S work for [Subsidiary IGT]. . . .
>
> (E) That upon request or at the time of leaving the employ of [Subsidiary IGT], he/she will deliver to [Subsidiary IGT], and not keep or deliver to anyone else, any and all drawings, blueprints, notes, memoranda, specifications, devices, documents, and in general any and all material relating to [Subsidiary IGT's] business.
>
> (F) To regard and preserve as confidential all information obtained by EMPLOYEE pertaining to [Subsidiary IGT's] business and products, whether patented or

unpatented, and not to publish or disclose to others during the term of EMPLOYEE'S employment or thereafter such confidential information obtained while in the employ of [Subsidiary IGT].

31.     As a condition of their continued employment, all IGT employees are also required, annually, to acknowledge their receipt of and compliance with IGT's Code of Conduct, which provides in relevant part:

Confidential information (as defined below) is very important to the Company and the loss, theft, unauthorized disclosure or misuse of the Company's Confidential Information jeopardizes its business and causes harm. Employees possessing Confidential Information shall not at any time either during or after the termination of their employment disclose to any person or use for their own purposes any Confidential Information concerning the organisation, business, finances, transactions or affairs of the Company other than as required by local laws or regulations. "Confidential Information" means information (whether or not recorded in documentary form, or stored on any magnetic or optical disk or memory) relating to the business, products, affairs and finances of the Company for the time being confidential to the Company and trade secrets including, without limitation, technical data and knowhow relating to the business of the Company or any of its business contacts.

32.     IGT also protects the secrecy of the Encryption Source Code through the General Terms and Conditions that its customers must agree to in connection with their purchase of any IGT gaming cabinets that contain the sb NexGenII and BE2 Boards.

33.     Specifically, in connection with the sale of any gaming cabinets containing the sb NexGenII and BE2 Boards, IGT provides its customers with non-transferrable licenses to use the IGT software—including the Encryption Source Code—necessary to operate the cabinets. These Terms and Conditions provide in relevant part:

No source code or license to use source code is provided hereunder. Customer shall not reverse engineer, decompile, reverse compile or otherwise disassemble any Licensed Software. Customer shall not attempt to obtain the source code or other proprietary information from any Licensed Software.

Customer shall not . . . disclose or otherwise make available the Licensed Software to any third party.

Customer will not copy or modify, or permit any person other than IGT to copy or modify the Licensed Software or any part thereof.

Customer acknowledges that the Licensed Software, Updates, Upgrades, computer programs, system protocols and system documentation manuals supplied by IGT to Customer . . . and the intellectual property rights therein are proprietary to IGT . . . and title thereto remains in IGT . . . .

**Defendant Cobb Had Access to the Code**

34.     Although IGT tightly restricts access to the Source Code Repository, Defendant Cobb had access to the Encryption Source Code during—and by virtue of—his employment with IGT.

35.     Defendant Perry Cobb joined Acres Gaming Inc. in 1998 as a software engineer, and he continued in that role at IGT's Las Vegas office when IGT acquired Acres in 2003.  Both before and after IGT's acquisition of Acres, Cobb participated in the development of software used in connection with player-tracking systems, including specifically the development of the Encryption Source Code.  At the time of his departure from IGT, Cobb held the position of Engineering Manager, in which role he was responsible for supervision of software development for both the sb NexGenII Board and the BE2 Board.  By virtue of his position as a software engineer, and later Engineering Manager, Cobb had access to the Source Code Repository.

**The Individual Defendants Agreed to Keep IGT's Code Confidential**

36.     During their respective terms of employment at IGT, each of the Individual Defendants expressly agreed in writing, on multiple occasions, to keep IGT's code and other confidential information secret, not just while they remained employed at IGT but at all times thereafter.

37.     Defendant Saffari executed Invention and Secrecy Agreements with Subsidiary IGT containing the language quoted in Paragraph 30 above on June 16, 1986 and February 28, 2006.

38.     Defendant Cobb executed an Invention and Secrecy Agreement with Subsidiary IGT containing the language quoted in Paragraph 30 above on January 7, 2004.

39.     Defendant Cunningham executed an Invention and Secrecy Agreement with Subsidiary IGT containing the language quoted in Paragraph 30 above on February 3, 2006.

40.     The Individual Defendants were each also a party to one or more stock option agreements with International Game Technology in which they each agreed, in words or in substance, that they would not:

at any time after his or her employment by [International Game Technology] or a Subsidiary terminates disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the customer lists, product research, engineering data or other trade secrets of [IGT].

41.     Defendant Saffari signed agreements with International Game Technology containing the language quoted in Paragraph 40 (or substantially identical language) on or about April 10, 1990; September 26, 1990; May 5, 1995; December 29, 1995; December 17, 1996; December 31, 1996; December 17, 1997; March 5, 1999; March 23, 2001; December 31, 2001; March 6, 2003; March 26, 2003; February 3, 2004; December 31, 2004; November 10, 2006; and May 11, 2007.

42.     Defendant Cobb signed two agreements with International Game Technology containing the language quoted in Paragraph 40 on or about November 10, 2006.

43.     Defendant Cunningham signed one agreement with International Game Technology containing the language quoted in Paragraph 40 on or about February 6, 2006.

44.     Defendants Cobb and Cunningham were each also a party to one or more stock award agreements with International Game Technology whose terms contained section entitled Restrictive Covenants in which Cobb and Cunningham agreed that:

Both during and after the termination of [the employee's] employment with [International Game Technology] or a Subsidiary, [the employee] shall keep confidential and not disclose to other persons or entities, or use for any purpose other than as required in the course of [his] employment with [IGT], any and all Confidential Information," which is defined in the agreements to include "any information or material, regardless of how it is stored or disseminated, which is not generally known or available to the public, and which (i) is generated or collected by or utilized in the operation of [IGT] and relates to the actual or anticipated business or research or development of [IGT]; or (ii) is suggested by or results from any task assigned to [the employee] by [IGT] or work performed by [him] for or on behalf of [IGT]. . . .

Examples of Confidential Information include, but are not limited to . . . techniques, technical know-how, formulae, processes, designs, prototypes, models, software, . . . and research and development.

When [the employee's] employment with [International game Technology] or a Subsidiary ends for any reason . . . [the employee] will deliver promptly to [IGT] all property of [IGT] in [the employee's] possession, custody or control, including, but not limited to, all computers or other [IGT]-owned equipment, electronic data, notes, books, records, files, correspondence, drawings, software, program discs and other materials relating to [IGT's] business, products, and projects, including all copies thereof.

45.     Defendant Cobb accepted the terms quoted in paragraph 44 as a condition of his acceptance of a stock award from International Game Technology on December 16, 2012.

46.     Defendant Cunningham accepted the terms quoted in paragraph 44 as a condition of his acceptance of a stock award from International Game Technology on December 20, 2012.

47.     The Individual Defendants were each also a party to a Severance and General Release Agreement with Subsidiary IGT containing a term entitled "Confidential Information" that provides:

> Employee recognizes and acknowledges that, through association with IGT, he or she has had access to Trade Secret-Confidential Information of a technical or business nature relating to the business of IGT, which is not known to the industry at large.  Trade Secret-Confidential Information is defined to include, without limitation, specialized business methods, techniques, plans and know-how relating to IGT . . . and techniques and data of IGT and methods or practices of doing business used by IGT.  Employee recognizes that this Trade Secret-Confidential Information constitutes a valuable and unique asset of IGT, developed and perfected over considerable time and at substantial expense to IGT.  Employee shall not disclose, without the written consent of IGT or as compelled by law, to any person, firm, partnership, association or corporation such Trade Secret-Confidential Information, and Employee agrees to hold such Trade Secret-Confidential Information in trust for the sole benefit of IGT.  Employee shall not, for the direct or indirect benefit of another: (1) take with, without the written consent of IGT, any . . . computer software, electronically-stored data, recordings, master videotapes of any of the foregoing, or any other Trade Secret-Confidential Information relating to IGT; or (2) reconstruct the same or similar information from memory or from some other source associated with IGT.

48.     The Severance and General Release Agreements signed by the Individual Defendants also expressly reaffirmed and incorporated each employees' obligations under their respective stock agreements.

49.     Defendant Saffari executed a Severance and General Release Agreement with Subsidiary IGT containing the terms quoted or referenced in Paragraphs 47 and 48 on July 16, 2009.

50.     Defendant Cobb executed a Severance and General Release Agreement with Subsidiary IGT containing the terms quoted or referenced in Paragraphs 47 and 48 on April 3, 2014.

51.     Defendant Cunningham executed a Severance and General Release Agreement with Subsidiary IGT containing the terms quoted or referenced in Paragraphs 47 and 48 on November 7, 2013.

52.     As a condition of their continued employment by IGT, each of the Individual Defendants also acknowledged their receipt of and compliance with the requirements set forth in Paragraph 31 annually throughout their respective terms of employment at IGT.

**The Individual Defendants Agreed Not to Compete With IGT**

53.     In addition to their agreements to keep IGT's trade secrets confidential, each of the Individual Defendants also expressly agreed in writing not to compete with IGT for a limited period following the end of their employment with IGT.

54.     The stock option agreements executed by the Individual Defendants as set forth in Paragraphs 41–43 provide that:

> the [employee] agrees that for a period of one (1) year after he or she ceases to be employed by [International Game Technology] or a Subsidiary, the [employee] will not own, manage, control or associate with as an agent, officer, employee, investor, lender, or otherwise with any business entity which competes worldwide with the business of [IGT] in the design, manufacture and/or distribution of coin-operated gaming or amusement devices and/or lottery devices, systems or tickets . . . .

55.     In addition, the terms of the stock awards accepted by Defendants Cobb and Cunningham as set forth in Paragraphs 45 and 46 provided that:

> For a period of one (1) year after [the employee] ceases to be employed by [International Game Technology] or a Subsidiary, [the employee] will not engage on behalf of any person, company, or entity, in any activities worldwide, directly or indirectly, relating to the development, design, manufacture, sale, or distribution of gaming devices, gaming systems, or gaming content, or other products or services competitive with or similar to products or services offered by, developed by, designed by, manufactured by, sold by or distributed by [IGT].

**Defendants Compete With IGT**

56.     On July 16, 2009, Defendant Saffari executed a Severance and General Release Agreement acknowledging the termination of his employment with IGT effective June 12, 2009. The same day he signed the Agreement, Saffari incorporated LFG.

57.     On November 7, 2013, Defendant Cunningham executed a Severance and General Release Agreement acknowledging the termination of his employment with IGT effective

November 2, 2013.  According to public information, Cunningham began working for LFG the following month.

58.    On April 3, 2014, Defendant Cobb executed a Severance and General Release Agreement acknowledging the termination of his employment with IGT effective April 2, 2014. On information and belief, Cobb began working for LFG within the following six months.

59.    Like IGT, LFG markets a hardware and software system that is physically installed at a casino and allows for real-time player tracking.

60.    Among the hardware that LFG markets is a Patron Display Interface ("PDI") Module that, like the sb NexGen II Board, projects player information on the display of the gaming cabinet in which it is installed.

61.    Within the past year, LFG has marketed its system, including the PDI Interface, to customers of IGT.

**IGT Discovers that Defendants Have Stolen and Are Using Its Confidential Source Code**

62.    In the fall of 2014, after Defendants Cunningham and Cobb had left IGT and joined LFG, IGT began to receive customer inquiries regarding IGT's willingness to provide customers with the proprietary software applications that run on IGT's sb NexGen II and BE2 Boards.

63.    Follow-up conversations revealed that these customers had been solicited by LFG, which was marketing its competing devices, and that the customers desired copies of IGT's software to run on LFG's hardware—an application that was neither permitted by IGT's licenses nor authorized by regulators.

64.    These conversations also revealed that LFG's competing system did not include a separate physical connection to the secure server containing a casino's player information. Instead, during a meeting with a California-based customer in November 2014, IGT learned that LFG was installing its system by physically disconnecting the sb NexGenII Board from the BE2 Board and then physically connecting LFG's competing hardware (the PDI Module) to the BE2 Board.

65.    Because all data passing between the sb NexGenII Board and the BE2 Board is encrypted using IGT's proprietary encryption technology, the physical substitution of LFG's PDI

Module for IGT's sb NexGenII Board—though unlawful—would not allow LFG's hardware to project player information unless LFG's hardware was able to decrypt the data transmitted from IGT's BE2 Board.

66.     In light of this reported tampering with IGT's property, and the possibility that its former employees were improperly competing with IGT and/or improperly disclosing trade secrets in violation of their obligations to IGT, IGT sent letters to Defendant Cobb on January 19, 2015 and Defendant Cunningham on January 20, 2015 reminding them of their obligations and communicating IGT's expectation that the Individual Defendants would honor those obligations.

67.     Also on January 20, 2015, IGT sent a letter to Defendant Saffari in his capacity as CEO of LFG highlighting the non-competition and confidentiality obligations owed to IGT by Defendants Cobb and Cunningham and requesting that LFG not take any action to interfere with those obligations.

68.     None of the Individual Defendants responded in writing to IGT's letters of January 19 and 20, 2015.

69.     During a meeting on April 9, 2015, Defendant Saffari told representatives of IGT that LFG's hardware was able to decrypt data transmitted from the BE2 Board because LFG was in possession of IGT's encryption key, which Saffari claimed LFG had reverse-engineered.

70.     However, during a subsequent meeting on June 3, 2015, Defendant Saffari admitted that LFG is actually in possession of IGT's Encryption Source Code.

71.     Defendant Saffari's admission was corroborated shortly thereafter by Andrew Novotak Jr., a former employee of both IGT and LFG.

72.     On June 15, 2015, Mr. Novotak sent a letter to the Nevada State Gaming Control Board in which he asserted:

> During my employment with Leap Forward Gaming, Inc. as Vice President of Engineering, I discovered that a different branch of the firmware engineering department, not under my supervision, was using code and a codebase taken directly from gaming manufacturer IGT.

73.     Mr. Novotak provided IGT with a copy of his letter to the Nevada State Gaming Control Board on June 17, 2015.

74.     Information provided by Mr. Novotak to IGT further indicates that LFG possesses IGT's encryption technology source code and is using it in its PDI Module for the purpose of decrypting the encrypted player data transmitted by the BE2 Board.

75.     Contrary to Defendant Saffari's prior claims, the information provided by Mr. Novotak indicates that LFG has not "reverse-engineered" IGT's encryption technology but has instead incorporated IGT's Encryption Source Code verbatim into LFG's software, including IGT's unique naming convention for the categories of transmitted player information, IGT's unique process for dividing individual transmittals into multiple "packets" of data that must be reassembled upon receipt, and IGT's unique and distinct character string that is used to seed a random number generator used in the encryption and decryption process.

**IGT is Damaged by Defendants' Unlawful Conduct**

76.     Defendants' unlawful conduct has damaged IGT in numerous ways.

77.     *First*, by taking and using IGT's valuable and secret Encryption Source Code, Defendants have impaired the value of IGT's trade secret information.

78.     *Second*, by physically disconnecting each sb NexGenII Board from its associated BE2 Board, Defendants have impaired the function of and otherwise damaged each sb NexGenII Board and BE2 Board, and have unlawfully trespassed upon IGT's personal property.

79.     *Third*, by marketing under the LFG brand a product that in fact contains and requires the operation of IGT's Encryption Source Code, and by selling such a product to IGT's customers, Defendants have caused IGT to lose substantial revenue.

80.     Specifically, on information and belief, at least two IGT customers have recently entered into contracts for LFG hardware containing IGT's proprietary and trade secret Encryption Source Code, rather than contracting directly with IGT, resulting in lost goodwill and revenues in an amount to be proven at trial but estimated to be not less than $8 million.

81.     In addition, on information and belief, a number of IGT customers have delayed orders to replace existing gaming cabinets with cabinets containing the latest generation of IGT's gaming technology in light of LFG's marketing of competing hardware containing IGT's

proprietary and trade secret Encryption Source Code, resulting in lost goodwill and revenues in an amount to be proven at trial but estimated to be not less than $50 million.

### FIRST CAUSE OF ACTION

**Trade Secret Misappropriation in Violation of N.R.S. 600A**
**(Against Defendants LFG, Saffari, and Cobb)**

82.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

83.     IGT's Encryption Source Code constitutes valuable trade information that is not generally known to or readily ascertainable by the public, and that derives independent value from the fact that it is not generally known.

84.     IGT takes reasonable steps to preserve the secrecy of its Encryption Source Code, including by maintaining it in a source code repository to which access is limited and controlled, by requiring those employees with access to agree to preserve the secrecy of the source code both during and following their employment at IGT, and by including terms in its license agreements that prevent customers from accessing the compiled code contained in IGT's consumer hardware.

85.     Defendant Cobb misappropriated IGT's Encryption Source Code by accessing the source code repository and creating a copy of the Encryption Source Code that was not returned to IGT upon termination of the employee's employment but was instead disclosed to LFG without IGT's consent in violation of the Individual Defendants' contractual obligations to IGT.

86.     Defendant Saffari misappropriated IGT's Encryption Source Code by acquiring IGT's Encryption Source Code while knowing or having reason to know that the Encryption Source Code was acquired by improper means.

87.     LFG misappropriated IGT's Encryption Source Code by acquiring IGT's Encryption Source Code while knowing or having reason to know that the Encryption Source Code was acquired by one or more of the Individual Defendants by improper means.

88.     As a result of Defendants LFG, Saffari, and Cobb's misappropriation of the Encryption Source Code, IGT has incurred losses, and Defendants have been unjustly enriched, in amounts to be proven at trial.

89.     In addition, Defendants LFG, Saffari, and Cobb's misappropriation and continuing use of IGT's Encryption Source Code has caused and is continuing to cause IGT irreparable harm, including the loss of customer and regulator goodwill and the threatened loss of IGT's proprietary trade secrets, for which no adequate remedy exists at law.

90.     Defendants LFG, Saffari, and Cobb's conduct therefore constitutes a violation of Nevada Revised Statutes 600A for which Plaintiffs are entitled to both damages and injunctive relief.

## SECOND CAUSE OF ACTION

**Unlawful Access to a Protected Computer in Violation of
the Computer Fraud and Abuse Act, 18 U.S.C. § 1030
(Against LFG)**

91.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

92.     On one or more occasions, LFG, acting through its employees or agents, has intentionally accessed a BE2 Board computer without authorization and has thereby obtained access to data transmitted by that BE2 Board computer.

93.     LFG's unauthorized accessing of IGT's BE2 Board computers has caused IGT losses of not less than $5,000 in the past year, including but not limited to the costs IGT has incurred in investigating and responding to each instance of such unauthorized access, conducting a damage assessment, and restoring its systems to their prior condition, as well as lost revenue.

94.     In addition, LFG's misappropriation and continuing use of IGT's Encryption Source Code has caused and is continuing to cause IGT irreparable harm, including the loss of customer and regulator goodwill and the threatened loss of IGT's proprietary trade secrets, for which no adequate remedy exists at law.

95.     LFG's conduct therefore constitutes a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, for which Plaintiffs are entitled to both damages and injunctive relief.

## THIRD CAUSE OF ACTION

**Unlawful Access to a Protected Computer in Violation of
the Computer Fraud and Abuse Act, 18 U.S.C. § 1030
(Against Defendant Cobb)**

96.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

97.     On one or more occasions, Defendant Cobb accessed IGT's source code repository in excess of his authorization to do so and thereby obtained a copy of IGT's Encryption Source Code that was subsequently disclosed to and used by LFG without IGT's consent.

98.     Defendant Cobb's accessing of IGT's source code repository in excess of his authorization has caused IGT losses of not less than $5,000 in the past year, including but not limited to the costs IGT has incurred in investigating and responding to the purloining of its secret Encryption Source Code and conducting a damage assessment, as well as lost revenue.

99.     In addition, Defendant Cobb's misappropriation and continuing use of IGT's Encryption Source Code has caused and is continuing to cause IGT irreparable harm, including the loss of customer and regulator goodwill and the threatened loss of IGT's proprietary trade secrets, for which no adequate remedy exists at law.

100.     Defendant Cobb's conduct therefore constitutes a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, for which Plaintiffs are entitled to both damages and injunctive relief.

**FOURTH CAUSE OF ACTION**

**Unlawful Access to a Protected Computer
in Violation of N.R.S. 205.4765
(Against LFG)**

101.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

102.     On one or more occasions, LFG, acting through its employees or agents, has knowingly, willfully and without authorization obtained, attempted to obtain, taken, transferred, copied, used, and/or retained possession of data which exists inside one or more BE2 Board computers.

103.     LFG's conduct therefore constitutes a violation of N.R.S. 205.4765 for which Plaintiffs are entitled to damages for response costs, loss, and injury suffered; punitive damages; and costs and reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION

**Unlawful Access to a Protected Computer
in Violation of N.R.S. 205.4765
(Against Defendant Cobb)**

104.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

105.    On one or more occasions, Defendant Cobb knowingly, willfully, and without authorization took, obtained, copied, retained possession of, transferred, disclosed, and/or used data—namely IGT's Encryption Source Code—existing inside IGT's source code repository.

106.    Defendant Cobb's conduct therefore constitutes a violation of N.R.S. 205.4765 for which Plaintiffs are entitled to damages for responses costs, loss, and injury suffered; punitive damages; and costs and reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION

**Reverse Passing Off in Violation of the Lanham Act, 15 U.S.C. § 1125(a)
(Against LFG)**

107.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

108.    On one or more occasions, LFG has marketed, licensed, and/or sold products containing proprietary Encryption Source Code that originated with IGT while representing to consumers that the products originated with LFG.

109.    LFG's false designation of the origin of the code on which its products operate is likely to cause, and has caused, consumer confusion.

110.    As a result of LFG's conduct, IGT has been harmed in an amount to be proven at trial.

111.    In addition, LFG's misappropriation and continuing use of IGT's Encryption Source Code has caused and is continuing to cause IGT irreparable harm, including the loss of customer and regulator goodwill and the threatened loss of IGT's proprietary trade secrets, for which no adequate remedy exists at law.

112.    LFG's conduct therefore constitutes a violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), for which Plaintiffs are entitled to both damages and injunctive relief.

**SEVENTH CAUSE OF ACTION**

**Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

113.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

114.    On or about April 10, 1990, Defendant Saffari executed an Incentive Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after termination disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

115.    The April 10, 1990 Incentive Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

116.    International Game Technology has fulfilled all of its contractual obligations under the April 10, 1990 Incentive Stock Option Agreement.

117.    By disclosing, discussing, copying, or otherwise using IGT's Encryption Source Code or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the April 10, 1990 Incentive Stock Option Agreement.

118.    As a result of Defendant Saffari's breach of the April 10, 1990 Incentive Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

**EIGTH CAUSE OF ACTION**

**Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

119.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

120.    On or about September 26, 1990, Defendant Saffari executed an Incentive Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time termination disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

121.     The September 26, 1990 Incentive Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

122.     International Game Technology has fulfilled all of its contractual obligations under the September 26, 1990 Incentive Stock Option Agreement.

123.     By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the September 26, 1990 Incentive Stock Option Agreement.

124.     As a result of Defendant Saffari's breach of the September 26, 1990 Incentive Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### Breach of Contract
### (Against Defendant Mohamad Ali Saffari)

125.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

126.     On or about May 5, 1995, Defendant Saffari executed an Incentive Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after termination disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

127.     The May 5, 1995 Incentive Stock Option Agreement further provides that "In the event of litigation of the Agreement the prevailing party shall be entitled to recover costs of the action, including reasonable attorney fees."

128.     The May 5, 1995 Incentive Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

129.     International Game Technology has fulfilled all of its contractual obligations under the May 5, 1995 Incentive Stock Option Agreement.

130.     By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the May 5, 1995 Incentive Stock Option Agreement.

131.    As a result of Defendant Saffari's breach of the May 5, 1995 Incentive Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

**Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

132.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

133.    On or about May 5, 1995, Defendant Saffari executed a second Incentive Stock Option Agreement (the "Second May 5, 1995 Agreement") with International Game Technology in which he agreed that he would not, "at any time after termination disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

134.    The Second May 5, 1995 Agreement further provides that "In the event of litigation of the Agreement the prevailing party shall be entitled to recover costs of the action, including reasonable attorney fees."

135.    The Second May 5, 1995 Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

136.    International Game Technology has fulfilled all of its contractual obligations under the Second May 5, 1995 Agreement.

137.    By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the Second May 5, 1995 Agreement.

138.    As a result of Defendant Saffari's breach of the Second May 5, 1995 Agreement, IGT has been damaged in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

**Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

139.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

140.    On or about December 29, 1995, Defendant Saffari executed an Incentive Stock Option Agreement with International Game Technology in which he agreed that he would not, "at

any time after termination disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

141.    The December 29, 1995 Incentive Stock Option Agreement further provides that "In the event of litigation of the Agreement the prevailing party shall be entitled to recover costs of the action, including reasonable attorney fees."

142.    The December 29, 1995 Incentive Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

143.    International Game Technology has fulfilled all of its contractual obligations under the December 29, 1995 Incentive Stock Option Agreement.

144.    By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the December 29, 1995 Incentive Stock Option Agreement.

145.    As a result of Defendant Saffari's breach of the December 29, 1995 Incentive Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

### Breach of Contract
### (Against Defendant Mohamad Ali Saffari)

146.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

147.    On or about December 17, 1996, Defendant Saffari executed an Incentive Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after termination disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

148.    The December 17, 1996 Incentive Stock Option Agreement further provides that "In the event of litigation of the Agreement the prevailing party shall be entitled to recover costs of the action, including reasonable attorney fees."

149.    The December 17, 1996 Incentive Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

150.    International Game Technology has fulfilled all of its contractual obligations under the December 17, 1996 Incentive Stock Option Agreement.

151.    By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the December 17, 1996 Incentive Stock Option Agreement.

152.    As a result of Defendant Saffari's breach of the December 17, 1996 Incentive Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

### THIRTEENTH CAUSE OF ACTION

**Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

153.    Plaintiffs hereby incorporates the foregoing paragraphs as if fully stated herein.

154.    On or about December 31, 1996, Defendant Saffari executed an Incentive Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after termination disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

155.    The December 31, 1996 Incentive Stock Option Agreement further provides that "In the event of litigation of the Agreement the prevailing party shall be entitled to recover costs of the action, including reasonable attorney fees."

156.    The December 31, 1996 Incentive Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

157.    IGT has fulfilled all of its contractual obligations under the December 31, 1996 Incentive Stock Option Agreement.

158.    By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the December 31, 1996 Incentive Stock Option Agreement.

159.    As a result of Defendant Saffari's breach of the December 31, 1996 Incentive Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

### FOURTEENTH CAUSE OF ACTION

**Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

160.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

161.    On or about December 17, 1997, Defendant Saffari executed an Incentive Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after termination disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

162.    The December 17, 1997 Incentive Stock Option Agreement further provides that "In the event of litigation of the Agreement the prevailing party shall be entitled to recover costs of the action, including reasonable attorney fees."

163.    The December 17, 1997 Incentive Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

164.    International Game Technology has fulfilled all of its contractual obligations under the December 17, 1997 Incentive Stock Option Agreement.

165.    By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the December 17, 1997 Incentive Stock Option Agreement.

166.    As a result of Defendant Saffari's breach of the December 17, 1997 Incentive Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

### FIFTEENTH CAUSE OF ACTION

**Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

167.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

168.    On or about March 5, 1999, Defendant Saffari executed an Incentive Stock Option Agreement with IGT in which he agreed that he would not, "at any time after termination disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

169.    The March 5, 1999 Incentive Stock Option Agreement further provides that "In the event of litigation of the Agreement the prevailing party shall be entitled to recover costs of the action, including reasonable attorney fees."

170.    The March 5, 1999 Incentive Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

171.    International Game Technology has fulfilled all of its contractual obligations under the March 5, 1999 Incentive Stock Option Agreement.

172.    By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the March 5, 1999 Incentive Stock Option Agreement.

173.    As a result of Defendant Saffari's breach of the March 5, 1999 Incentive Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

**SIXTEENTH CAUSE OF ACTION**

**Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

174.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

175.    On or about March 5, 1999, Defendant Saffari executed a Nonqualified Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after termination disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

176. The March 5, 1999 Nonqualified Stock Option Agreement further provides that "In the event of litigation of the Agreement the prevailing party shall be entitled to recover costs of the action, including reasonable attorney fees."

177. The March 5, 1999 Nonqualified Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

178. International Game Technology has fulfilled all of its contractual obligations under the March 5, 1999 Nonqualified Stock Option Agreement.

179. By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the March 5, 1999 Nonqualified Stock Option Agreement.

180. As a result of Defendant Saffari's breach of the March 5, 1999 Nonqualified Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

## SEVENTEENTH CAUSE OF ACTION

### Breach of Contract
### (Against Defendant Mohamad Ali Saffari)

181. Plaintiffs hereby incorporates the foregoing paragraphs as if fully stated herein.

182. On or about March 23, 2001, Defendant Saffari executed a Nonqualified Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after termination disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

183. The March 23, 2001 Nonqualified Stock Option Agreement further provides that "In the event of litigation of the Agreement the prevailing party shall be entitled to recover costs of the action, including reasonable attorney fees."

184. The March 23, 2001 Nonqualified Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

185. International Game Technology has fulfilled all of its contractual obligations under the March 23, 2001 Nonqualified Stock Option Agreement.

186.     By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the March 23, 2001 Nonqualified Stock Option Agreement.

187.     As a result of Defendant Saffari's breach of the March 23, 2001 Nonqualified Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

<strong><u>EIGHTEENTH CAUSE OF ACTION</u></strong>

<strong>Breach of Contract<br>(Against Defendant Mohamad Ali Saffari)</strong>

188.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

189.     On or about December 31, 2001, Defendant Saffari executed a Nonqualified Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after termination disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

190.     The December 31, 2001 Nonqualified Stock Option Agreement further provides that "In the event of litigation of the Agreement the prevailing party shall be entitled to recover costs of the action, including reasonable attorney fees."

191.     The December 31, 2001 Nonqualified Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

192.     International Game Technology has fulfilled all of its contractual obligations under the December 31, 2001 Nonqualified Stock Option Agreement.

193.     By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the December 31, 2001 Nonqualified Stock Option Agreement.

194.     As a result of Defendant Saffari's breach of the December 31, 2001 Nonqualified Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

## NINETEENTH CAUSE OF ACTION

### Breach of Contract
### (Against Defendant Mohamad Ali Saffari)

195.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

196.    On or about March 6, 2003, Defendant Saffari executed a Nonqualified Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after his . . . employment by [IGT] terminates[,] disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

197.    The March 6, 2003 Nonqualified Stock Option Agreement further provides that "In the event of litigation with respect to [the Agreement], the prevailing party shall be entitled to recover such party's costs of the action, including reasonable attorneys fees."

198.    The March 6, 2003 Nonqualified Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

199.    International Game Technology has fulfilled all of its contractual obligations under the March 6, 2003 Nonqualified Stock Option Agreement.

200.    By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the March 6, 2003 Nonqualified Stock Option Agreement.

201.    As a result of Defendant Saffari's breach of the March 6, 2003 Nonqualified Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

## TWENTIETH CAUSE OF ACTION

### Breach of Contract
### (Against Defendant Mohamad Ali Saffari)

202.    Plaintiffs hereby incorporates the foregoing paragraphs as if fully stated herein.

203.    On or about March 26, 2003, Defendant Saffari executed a Nonqualified Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after his . . . employment by [IGT] terminates[,] disclose, discuss, copy or otherwise use

1    or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT],

2    the . . . product research, engineering data or other trade secrets of [IGT]."

3         204.    The March 26, 2003 Nonqualified Stock Option Agreement further provides that

4    "In the event of litigation with respect to [the Agreement], the prevailing party shall be entitled to

5    recover such party's costs of the action, including reasonable attorneys fees."

6         205.    The March 26, 2003 Nonqualified Stock Option Agreement is a valid and binding

7    contract between International Game Technology and Defendant Saffari.

8         206.    International Game Technology  has fulfilled all of its contractual obligations under

9    the March 26, 2003 Nonqualified Stock Option Agreement.

10        207.    By disclosing, discussing, copying, or otherwise using or suffering IGT's

11   Encryption Source Code to be used in competition with and contrary to the interests of IGT,

12   Defendant Saffari has breached the March 26, 2003 Nonqualified Stock Option Agreement.

13        208.    As a result of Defendant Saffari's breach of the March 26, 2003 Nonqualified

14   Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

15                          **TWENTY-FIRST CAUSE OF ACTION**

16                                **Breach of Contract**
                        **(Against Defendant Mohamad Ali Saffari)**
17

18        209.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

19        210.    On or about February 3, 2004, Defendant Saffari executed a Nonqualified Stock

20   Option Agreement with International Game Technology in which he agreed that he would not, "at

21   any time after his . . . employment by [IGT] terminates[,] disclose, discuss, copy or otherwise use

22   or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT],

23   the . . . product research, engineering data or other trade secrets of [IGT]."

24        211.    The February 3, 2004 Nonqualified Stock Option Agreement further provides that

25   "In the event of litigation with respect to [the Agreement], the prevailing party shall be entitled to

26   recover such party's costs of the action, including reasonable attorneys fees."

27        212.    The February 3, 2004 Nonqualified Stock Option Agreement is a valid and binding

28   contract between International Game Technology and Defendant Saffari.

213.    International Game Technology has fulfilled all of its contractual obligations under the February 3, 2004 Nonqualified Stock Option Agreement.

214.    By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the February 3, 2004 Nonqualified Stock Option Agreement.

215.    As a result of Defendant Saffari's breach of the February 3, 2004 Nonqualified Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

<u>**TWENTY-SECOND CAUSE OF ACTION**</u>

**Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

216.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

217.    On or about December 31, 2004, Defendant Saffari executed a Nonqualified Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after his . . . employment by [IGT] terminates[,] disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

218.    The December 31, 2004 Nonqualified Stock Option Agreement further provides that "In the event of litigation with respect to [the Agreement], the prevailing party shall be entitled to recover such party's costs of the action, including reasonable attorneys fees."

219.    The December 31, 2004 Nonqualified Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

220.    International Game Technology has fulfilled all of its contractual obligations under the December 31, 2004 Nonqualified Stock Option Agreement.

221.    By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the December 31, 2004 Nonqualified Stock Option Agreement.

222.    As a result of Defendant Saffari's breach of the December 31, 2004 Nonqualified Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

**TWENTY-THIRD CAUSE OF ACTION**

**Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

223.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

224.    On or about November 10, 2006, Defendant Saffari executed a Nonqualified Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after his . . . employment by [IGT] terminates[,] disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

225.    The November 10, 2006 Nonqualified Stock Option Agreement further provides that "In the event of litigation with respect to [the Agreement], the prevailing party shall be entitled to recover such party's costs of the action, including reasonable attorneys fees."

226.    The November 10, 2006 Nonqualified Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

227.    International Game Technology has fulfilled all of its contractual obligations under the November 10, 2006 Nonqualified Stock Option Agreement.

228.    By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the November 10, 2006 Nonqualified Stock Option Agreement.

229.    As a result of Defendant Saffari's breach of the November 10, 2006 Nonqualified Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

**TWENTY-FOURTH CAUSE OF ACTION**

**Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

230.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

231.    On or about May 11, 2007, Defendant Saffari executed a Nonqualified Stock Option Agreement with International Game Technology in which he agreed that he would not, "at any time after his . . . employment by [IGT] terminates[,] disclose, discuss, copy or otherwise use

1 | or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT],

2 | the . . . product research, engineering data or other trade secrets of [IGT]."

3 |      232.    The May 11, 2007 Nonqualified Stock Option Agreement further provides that "In

4 | the event of litigation with respect to [the Agreement], the prevailing party shall be entitled to

5 | recover such party's costs of the action, including reasonable attorneys fees."

6 |      233.    The May 11, 2007 Nonqualified Stock Option Agreement is a valid and binding

7 | contract between International Game Technology and Defendant Saffari.

8 |      234.    International Game Technology has fulfilled all of its contractual obligations under

9 | the May 11, 2007 Nonqualified Stock Option Agreement.

10 |      235.    By disclosing, discussing, copying, or otherwise using or suffering IGT's

11 | Encryption Source Code to be used in competition with and contrary to the interests of IGT,

12 | Defendant Saffari has breached the May 11, 2007 Nonqualified Stock Option Agreement.

13 |      236.    As a result of Defendant Saffari's breach of the May 11, 2007 Nonqualified Stock

14 | Option Agreement, IGT has been damaged in an amount to be proven at trial.

15 | **TWENTY-FIFTH CAUSE OF ACTION**

16 | **Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

17 |

18 |      237.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

19 |      238.    On July 16, 2009, Defendant Saffari executed a Severance and General Release

20 | Agreement with Subsidiary IGT in which he agreed that he would "not, for the direct or indirect

21 | benefit of another: (1) take with, without the written consent of IGT, any . . . documents, computer

22 | software, electronically-stored data . . . or any other Trade Secret-Confidential Information

23 | relating to IGT; or (2) reconstruct the same or similar information from memory or from some

24 | other source associated with IGT."

25 |      239.    In the July 16, 2009 Severance and General Release Agreement, Defendant Saffari

26 | also expressly "reaffirm[ed] each of his . . . obligations pursuant to [his various] Stock

27 | Agreements," which were "fully incorporated into" the Severance and General Release

28 | Agreement.

240.    The July 16, 2009 Severance and General Release Agreement further provides that "In the event of any dispute with respect to the performance or enforcement of this Agreement, the prevailing party shall be entitled to recover its reasonable expenses including all court costs and attorneys' fees.

241.    The July 16, 2009 Severance and General Release Agreement is a valid and binding contract between Subsidiary IGT and Defendant Saffari.

242.    Subsidiary IGT has fulfilled all of its contractual obligations under the July 16, 2009 Severance and General Release Agreement.

243.    By taking, disclosing, discussing, copying, reconstructing from memory or from some other source associated with IGT, or otherwise by using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Saffari has breached the July 16, 2009 Severance and General Release Agreement.

244.    As a result of Defendant Saffari's breach of the July 16, 2009 Severance and General Release Agreement, Subsidiary IGT has been damaged in an amount to be proven at trial.

## TWENTY-SIXTH CAUSE OF ACTION

### Breach of Contract
### (Against Defendant Mohamad Ali Saffari)

245.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

246.    On June 16, 1986, Defendant Saffari executed an Invention and Secrecy Agreement with Subsidiary IGT in which he agreed "That during his . . . employment term and thereafter he [would] hold in strictest confidence, and not disclose to any other person, firm, or corporation, without the express written authorization of an Officer of [IGT], any information, manufacturing technique, process, formula, development or experimental work, work in process, business, trade secret, or any other secret or confidential matter relating to the products, sales, or business of [IGT] or its affiliates or subsidiaries except as such disclosure or use may be required in connection with [Saffari's] work for [IGT]. . . ."

247.    In the June 16, 1986 Invention and Secrecy Agreement, Defendant Saffari also agreed "To regard and preserve as confidential all information [that he had] obtained . . .

pertaining to [IGT's] business and products, whether patented or unpatented, and not to publish or disclose to others during the term of [his] employment or thereafter such confidential information obtained while in the employ of [IGT]."

248.    The June 16, 1986 Invention and Secrecy Agreement is a valid and binding contract between Subsidiary IGT and Defendant Saffari.

249.    Subsidiary IGT has fulfilled all of its contractual obligations under the June 16, 1986 Invention and Secrecy Agreement.

250.    By failing to hold IGT's Encryption Source Code in strictest confidence or to regard and preserve it as confidential, and by instead using it or permitting it to be used by LFG, Defendant Saffari has breached the June 16, 1986 Invention and Secrecy Agreement.

251.    As a result of Defendant Saffari's breach of the June 16, 1986 Invention and Secrecy Agreement, Subsidiary IGT has been damaged in an amount to be proven at trial.

### TWENTY-SEVENTH CAUSE OF ACTION

**Breach of Contract**
**(Against Defendant Mohamad Ali Saffari)**

252.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

253.    On February 28, 2006, Defendant Saffari executed an Invention and Secrecy Agreement with Subsidiary IGT in which he agreed "That during his . . . employment term and thereafter he [would] hold in strictest confidence, and not disclose to any other person, firm, or corporation, without the express written authorization of an Officer of [IGT], any information, manufacturing technique, process, formula, development or experimental work, work in process, business, trade secret, or any other secret or confidential matter relating to the products, sales, or business of [IGT] or its affiliates or subsidiaries except as such disclosure or use may be required in connection with [Saffari's] work for [IGT]. . . ."

254.    In the February 28, 2006 Invention and Secrecy Agreement, Defendant Saffari also agreed "To regard and preserve as confidential all information [that he had] obtained . . . pertaining to [IGT's] business and products, whether patented or unpatented, and not to publish or

disclose to others during the term of [his] employment or thereafter such confidential information obtained while in the employ of [IGT]."

255.   The February 28, 2006 Invention and Secrecy Agreement is a valid and binding contract between Subsidiary IGT and Defendant Saffari.

256.   Subsidiary IGT has fulfilled all of its contractual obligations under the February 28, 2006 Invention and Secrecy Agreement.

257.   By failing to hold IGT's Encryption Source Code in strictest confidence or to regard and preserve it as confidential, and by instead using it or permitting it to be used by LFG, Defendant Saffari has breached the February 28, 2006 Invention and Secrecy Agreement.

258.   As a result of Defendant Saffari's breach of the February 28, 2006 Invention and Secrecy Agreement, Subsidiary IGT has been damaged in an amount to be proven at trial.

### TWENTY-EIGHTH CAUSE OF ACTION

**Breach of Contract**
**(Against Defendant Perry Cobb)**

259.   Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

260.   On January 7, 2004, Defendant Cobb executed an Invention and Secrecy Agreement with Subsidiary IGT in which he agreed "That during his . . . employment term and thereafter he [would] hold in strictest confidence, and not disclose to any other person, firm, or corporation, without the express written authorization of an Officer of [IGT], any information, manufacturing technique, process, formula, development or experimental work, work in process, business, trade secret, or any other secret or confidential matter relating to the products, sales, or business of [IGT] or its affiliates or subsidiaries except as such disclosure or use may be required in connection with [Cobb's] work for [IGT]. . . ."

261.   In the January 7, 2004 Invention and Secrecy Agreement, Defendant Cobb also agreed "That upon request or at the time of leaving the employ of [IGT], he [would] deliver to [IGT], and not keep or deliver to anyone else, any and all drawings, blueprints, notes, memoranda, specifications, devices, documents, and in general any and all material relating to [IGT's] business."

262.     In the January 7, 2004 Invention and Secrecy Agreement, Defendant Cobb also agreed "To regard and preserve as confidential all information [that he had] obtained . . . pertaining to [IGT's] business and products, whether patented or unpatented, and not to publish or disclose to others during the term of [his] employment or thereafter such confidential information obtained while in the employ of [IGT]."

263.     The January 7, 2004 Invention and Secrecy Agreement is a valid and binding contract between Subsidiary IGT and Defendant Cobb.

264.     Subsidiary IGT has fulfilled all of its contractual obligations under the January 7, 2004 Invention and Secrecy Agreement.

265.     By failing to hold IGT's Encryption Source Code in strictest confidence, and instead taking, disclosing, delivering, and/or using it or permitting it to be used by LFG, Defendant Cobb has breached the January 7, 2004 Invention and Secrecy Agreement.

266.     As a result of Defendant Cobb's breach of the January 7, 2004 Invention and Secrecy Agreement, Subsidiary IGT has been damaged in an amount to be proven at trial.

**TWENTY-NINTH CAUSE OF ACTION**

**Breach of Contract**
**(Against Defendant Perry Cobb)**

267.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

268.     On or about November 10, 2006, Defendant Cobb executed a Restricted Stock Award Agreement with International Game Technology in which he agreed that he would not, "at any time after his . . . employment by [IGT] terminates[,] disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

269.     In the November 10, 2006 Restricted Stock Award Agreement, Defendant Cobb further agreed that "for a period of one (1) year after he . . . ceases to be employed by [IGT], [he would] not own, manage, control or associate with as an agent, officer, employee, investor, lender, or otherwise with any business entity which competes worldwide with the business of [IGT] in the

design, manufacture and/or distribution of coin-operated gaming or amusement devices and/or lottery devices, systems or tickets . . . ."

270.   The November 10, 2006 Restricted Stock Award Agreement is a valid and binding contract between International Game Technology and Defendant Cobb.

271.   International Game Technology has fulfilled all of its contractual obligations under the November 10, 2006 Restricted Stock Award Agreement.

272.   By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Cobb has breached the November 10, 2006 Restricted Stock Award Agreement.

273.   In addition, by associating with LFG as an employee within one year after he ceased to be employed by IGT, Defendant Cobb has breached the November 10, 2006 Restricted Stock Award Agreement.

274.   As a result of Defendant Cobb's breach of the November 10, 2006 Restricted Stock Award Agreement, IGT has been damaged in an amount to be proven at trial.

### THIRTIETH CAUSE OF ACTION

**Breach of Contract**
**(Against Defendant Perry Cobb)**

275.   Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

276.   On or about November 10, 2006, Defendant Cobb executed a Nonqualified Stock Award Agreement with International Game Technology in which he agreed that he would not, "at any time after his . . . employment by [IGT] terminates[,] disclose, discuss, copy or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the [IGT], the . . . product research, engineering data or other trade secrets of [IGT]."

277.   In the November 10, 2006 Nonqualified Stock Award Agreement, Defendant Cobb further agreed that "for a period of one (1) year after he . . . ceases to be employed by [IGT], [he would] not own, manage, control or associate with as an agent, officer, employee, investor, lender, or otherwise with any business entity which competes worldwide with the business of [IGT] in the

design, manufacture and/or distribution of coin-operated gaming or amusement devices and/or lottery devices, systems or tickets . . . ."

278.   The November 10, 2006 Nonqualified Stock Award Agreement further provides that "In the event of litigation with respect to [the Agreement], the prevailing party shall be entitled to recover such party's costs of the action, including reasonable attorneys fees."

279.   The November 10, 2006 Nonqualified Stock Award Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

280.   International Game Technology has fulfilled all of its contractual obligations under the November 10, 2006 Nonqualified Stock Award Agreement.

281.   By disclosing, discussing, copying, or otherwise using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Cobb has breached the November 10, 2006 Nonqualified Stock Award Agreement.

282.   In addition, by associating with LFG as an employee within one year after he ceased to be employed by IGT, Defendant Cobb has breached the November 10, 2006 Nonqualified Stock Award Agreement.

283.   As a result of Defendant Cobb's breach of the November 10, 2006 Nonqualified Stock Award Agreement, IGT has been damaged in an amount to be proven at trial.

## THIRTY-FIRST CAUSE OF ACTION

### Breach of Contract
### (Against Defendant Perry Cobb)

284.   Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

285.   On December 16, 2012, as a condition of his acceptance of an award of stock by International Game Technology , Defendant Cobb agreed that "during and after the termination of [his] employment with [IGT], [he] shall keep confidential and not disclose to other persons or entities, or use for any purpose other than as required in the course of [his] employment with [IGT], any and all Confidential Information," which was defined to include "any information or material, regardless of how it is stored or disseminated, which is not generally known or available to the public, and which (i) is generated or collected by or utilized in the operation of [IGT] and

relates to the actual or anticipated business or research or development of [IGT]; or (ii) is suggested by or results from any task assigned to [Cobb] by [IGT] or work performed by [him] for or on behalf of [IGT]. . . .”

286.    As a condition of his acceptance of the same award, Defendant Cobb also agreed that “When [his] employment with [IGT] ends for any reason . . . [he] w[ould] deliver promptly to [IGT] all property of [IGT] in [his] possession, custody or control, including, but not limited to, all computers or other [IGT]-owned equipment, electronic data, notes, books, records, files, correspondence, drawings, software, program discs and other materials relating to [IGT's] business, products, and projects, including all copies thereof.”

287.    As a condition of his acceptance of the same award, Defendant Cobb also agreed that “For a period of one (1) year after [he] ceases to be employed by [IGT], [he would] not engage on behalf of any person, company, or entity, in any activities worldwide, directly or indirectly, relating to the development, design, manufacture, sale, or distribution of gaming devices, gaming systems, or gaming content, or other products or services competitive with or similar to products or services offered by, developed by, designed by, manufactured by, sold by or distributed by [IGT].”

288.    As a condition of his acceptance of the same award, Defendant Cobb also “recognize[d] that [IGT's] business interests may be irreparably harmed by any violation of” the restrictive covenants contained therein “such that [IGT] shall, in addition to all other remedies available at law or in equity, be entitled to injunctive relief.”

289.    As a condition of his acceptance of the same award, Defendant Cobb also agreed that “In the event [IGT] successfully enforces any” of the restrictive covenants described in paragraphs 285, 286, and 287, he “will pay [IGT's] costs and attorneys' fees.”

290.    Defendant Cobb's December 16, 2012 agreement to the terms and conditions of an award of stock by International Game Technology created a valid and binding agreement between International Game Technology and Defendant Cobb.

291.     International Game Technology has fulfilled all of its contractual obligations under the agreement created by Defendant Cobb's December 16, 2012 agreement to the terms and conditions of IGT's award of stock.

292.     By failing to keep IGT's Encryption Source Code confidential, and instead taking, disclosing, delivering, and/or using it or permitting it to be used by LFG, Defendant Cobb has breached the agreement created by his December 16, 2012 agreement to the terms and conditions of International Game Technology's award of stock.

293.     In addition, by engaging on behalf of LFG in activities relating to the development, design, manufacture, sale, or distribution of gaming devices, gaming systems, or gaming content, or other products or services competitive with or similar to products or services offered by, developed by, designed by, manufactured by, sold by, or distributed by IGT within one year after he ceased to be employed by IGT, Defendant Cobb breached the agreement created by his December 16, 2012 agreement to the terms and conditions of International Game Technology's award of stock.

294.     As a result of Defendant Cobb's breach of the aforesaid agreement, IGT has been damaged in an amount to be proven at trial.

## THIRTY-SECOND OF ACTION

### Breach of Contract
### (Against Defendant Perry Cobb)

295.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

296.     On April 3, 2014, Defendant Cobb executed a Severance and General Release Agreement with Subsidiary IGT in which he agreed that he would "not, for the direct or indirect benefit of another: (1) take with, without the written consent of IGT, any . . . documents, computer software, electronically-stored data . . . or any other Trade Secret-Confidential Information relating to IGT; or (2) reconstruct the same or similar information from memory or from some other source associated with IGT."

297.     In the April 3, 2014 Severance and General Release Agreement, Defendant Cobb also expressly "reaffirm[ed] each of his . . . obligations pursuant to [his] Stock Agreements," which were "fully incorporated into" the Severance and General Release Agreement.

298.     The April 3, 2014 Severance and General Release Agreement further provides that "In the event of any dispute with respect to the performance or enforcement of this Agreement, the prevailing party shall be entitled to recover its reasonable expenses including all court costs and attorneys' fees.

299.     The April 3, 2014 Severance and General Release Agreement is a valid and binding contract between Subsidiary IGT and Defendant Cobb.

300.     Subsidiary IGT has fulfilled all of its contractual obligations under the April 3, 2014 Severance and General Release Agreement.

301.     By taking, disclosing, discussing, copying, reconstructing from memory or from some other source associated with IGT, or otherwise by using or suffering IGT's Encryption Source Code to be used in competition with and contrary to the interests of IGT, Defendant Cobb has breached the April 3, 2014 Severance and General Release Agreement.

302.     As a result of Defendant Cobb's breach of the April 3, 2014 Severance and General Release Agreement, IGT has been damaged in an amount to be proven at trial.

## THIRTY-THIRD CAUSE OF ACTION

**Breach of Contract**
**(Against Defendant Bruce Cunningham)**

303.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

304.     On December 20, 2012, as a condition of his acceptance of an award of stock by International Game Technology, Defendant Cunningham agreed that "For a period of one (1) year after [he] ceases to be employed by [IGT], [he would] not engage on behalf of any person, company, or entity, in any activities worldwide, directly or indirectly, relating to the development, design, manufacture, sale, or distribution of gaming devices, gaming systems, or gaming content, or other products or services competitive with or similar to products or services offered by, developed by, designed by, manufactured by, sold by or distributed by [IGT]."

305.    As a condition of his acceptance of the same award, Defendant Cunningham also "recognize[d] that [IGT's] business interests may be irreparably harmed by any violation of" the restrictive covenants contained therein "such that [IGT] shall, in addition to all other remedies available at law or in equity, be entitled to injunctive relief."

306.    As a condition of his acceptance of the same award, Defendant Cunningham also agreed that "In the event [IGT] successfully enforces any" of the restrictive covenants described in paragraph 304, he "will pay [IGT's] costs and attorneys' fees."

307.    Defendant Cunningham's December 20, 2012 agreement to the terms and conditions of an award of stock by International Game Technology created a valid and binding agreement between International Game Technology and Defendant Cunningham.

308.    International Game Technology has fulfilled all of its contractual obligations under the agreement created by Defendant Cunningham's December 20, 2012 agreement to the terms and conditions of International Game Technology's award of stock.

309.    By engaging on behalf of LFG in activities relating to the development, design, manufacture, sale, or distribution of gaming devices, gaming systems, or gaming content, or other products or services competitive with or similar to products or services offered by, developed by, designed by, manufactured by, sold by, or distributed by IGT within one year after he ceased to be employed by IGT, Defendant Cunningham breached the agreement created by his December 20, 2012 agreement to the terms and conditions of International Game Technology's award of stock.

310.    As a result of Defendant Cunningham's breach of the aforesaid agreement, IGT has been damaged in an amount to be proven at trial.

## THIRTY-FOURTH CAUSE OF ACTION

### Breach of Contract
### (Against Defendant Bruce Cunningham)

311.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

312.    On or about February 6, 2006, Defendant Cunningham executed an Incentive Stock Option Agreement with International Game Technology in which he agreed that "for a period of one (1) year after he . . . ceases to be employed by [IGT, he] will not own, manage, control or

associate with as agent, officer, employee, investor, lender, or otherwise with any business entity which competes worldwide with the business of [IGT] in the design, manufacture and/or distribution of coin-operated gaming or amusement devices and/or lottery devices, systems or tickets."

313.    The February 6, 2006 Incentive Stock Option Agreement further provides that "In the event of litigation of the Agreement the prevailing party shall be entitled to recover costs of the action, including reasonable attorney fees."

314.    The February 6, 2006 Incentive Stock Option Agreement is a valid and binding contract between International Game Technology and Defendant Saffari.

315.    International Game Technology has fulfilled all of its contractual obligations under the February 6, 2006 Incentive Stock Option Agreement.

316.    By associating as an employee with LFG, which competes with IGT in the design, manufacture, and distribution of coin-operated gaming and amusement devices and lottery devices, systems or tickets, within one year of the cessation of his employment with IGT, Defendant Cunningham breached the February 6, 2006 Incentive Stock Option Agreement.

317.    As a result of Defendant Cunningham's breach of the February 6, 2006 Incentive Stock Option Agreement, IGT has been damaged in an amount to be proven at trial.

## THIRTY-FIFTH CAUSE OF ACTION

### Breach of Contract
### (Against Defendant Bruce Cunningham)

318.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

319.    On November 7, 2013, Defendant Cunningham executed a Severance and General Release Agreement with Subsidiary IGT in which he "reaffirm[ed] each of his . . . obligations pursuant to [his] Stock Agreements," which were "fully incorporated into" the Severance and General Release Agreement.

320.    The November 7, 2013 Severance and General Release Agreement further provides that "In the event of any dispute with respect to the performance or enforcement of this

1   Agreement, the prevailing party shall be entitled to recover its reasonable expenses including all

2   court costs and attorneys' fees.

3          321.    The November 7, 2013 Severance and General Release Agreement is a valid and

4   binding contract between Subsidiary IGT and Defendant Cunningham.

5          322.    Subsidiary IGT has fulfilled all of its contractual obligations under the November

6   7, 2013 Severance and General Release Agreement.

7          323.    By engaging on behalf of LFG in activities relating to the development, design,

8   manufacture, sale, or distribution of gaming devices, gaming systems, or gaming content, or other

9   products or services competitive with or similar to products or services offered by, developed by,

10  designed by, manufactured by, sold by, or distributed by IGT within one year after he ceased to be

11  employed by IGT, and by associating as an employee with LFG, which competes with IGT in the

12  design, manufacture, and distribution of coin-operated gaming and amusement devices and lottery

13  devices, systems or tickets, within one year of the cessation of his employment with IGT,

14  Defendant Cunningham breached his obligations pursuant to his Stock Agreements and has

15  thereby breached the November 7, 2013 Severance and General Release Agreement.

16         324.    As a result of Defendant Cunningham's breach of the November 7, 2013 Severance

17  and General Release Agreement, IGT has been damaged in an amount to be proven at trial.

18                          **THIRTY-SIXTH CAUSE OF ACTION**

19                                 **Breach of Contract**
                           **(Against Defendants Saffari and Cobb)**
20

21         325.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

22         326.    Each year during the terms of their employment with IGT, each of the Individual

23  Defendants acknowledged and agreed in words or substance that they had received and, as a

24  condition of their continued employment at IGT, that they would comply with IGT's Code of

25  Conduct, which included the requirement (in words or substance) that they would not, any time

26  either during or after the termination of their employment, disclose to any person or use for their

27  own purposes any Confidential Information concerning IGT other than as required by local laws

28  or regulations.

327.    The Individual Defendants' agreement to abide by IGT's Code of Conduct (including its terms regarding confidential information) as a condition of continued employment gave rise to a valid and binding contract between Subsidiary IGT and each of the Individual Defendants.

328.    Subsidiary IGT has fulfilled all of the contractual obligations arising under the agreement formed by each Individual Defendant's acknowledgment and agreement to abide by the IGT Code of Conduct on an annual basis during each Individual Defendant's term of employment.

329.    By disclosing and/or using IGT's Encryption Source Code for their own purposes, Defendants Saffari and Cobb have breached each of the agreements arising from their respective acknowledgments and agreements to abide by the IGT Code of Conduct on an annual basis during their respective terms of employment.

330.    As a result of Defendants Saffari and Cobb's breach of the aforesaid agreements, IGT has been damaged in an amount to be proven at trial.

### THIRTY-SEVENTH CAUSE OF ACTION

**Tortious Interference with Contract**
**(Against LFG)**

331.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

332.    Defendant Cobb's December 16, 2012 agreement to the terms and conditions of an award of stock by International Game Technology created a valid and binding agreement between International Game Technology and Defendant Cobb, pursuant to which Defendant Cobb was obligated not to "engage on behalf of any person, company, or entity, in any activities worldwide, directly or indirectly, relating to the development, design, manufacture, sale, or distribution of gaming devices, gaming systems, or gaming content, or other products or services competitive with or similar to products or services offered by, developed by, designed by, manufactured by, sold by or distributed by [IGT]" for one year after he ceased to be employed by IGT.

333.    By letter dated January 20, 2015, IGT informed LFG, via its CEO Mohamad Ali Saffari, that Defendant Cobb was subject to "a one year, post separation, non-compete" obligation running from April 2, 2014 to April 2, 2015.

334.   Notwithstanding IGT's January 20, 2015 letter, LFG continued to employ Defendant Cobb throughout the period January 20, 2015 to April 2, 2015, inclusive.

335.   As a result of this continued employment, Defendant Cobb breached his December 16, 2012 agreement as set forth in Paragraph 293, causing damage to IGT.

336.   Defendant LFG's knowing and intentional continued employment of Defendant Cobb prior to April 2, 2015 notwithstanding its express knowledge of Defendant Cobb's contractual obligation not to compete with IGT for one year following the end of his employment at IGT constituted tortious interference with the December 16, 2012 agreement between International Game Technology and Cobb.

337.   As a result of Defendant LFG's tortious conduct, IGT has been damaged in an amount to be proven at trial.

### THIRTY-EIGHTH CAUSE OF ACTION

**Trespass to Chattel**
**(Against LFG)**

338.   Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

339.   On one or more occasions, LFG, acting through its employees or agents, has intentionally invaded IGT's property rights in one or more sb NexGenII Boards and BE2 Boards by physically disconnecting one or more sb NexGenII Boards from the associated BE2 Board, by physically connecting LFG's own hardware to one or more BE2 Boards, and by using such unauthorized connection(s) to access data transmitted by the BE2 Board(s).

340.   As a result of LFG's tortious conduct, IGT has been damaged in an amount to be proven at trial.

### THIRTY-NINTH CAUSE OF ACTION

**Replevin Pursuant to N.R.S. 17.120**
**(Against All Defendants)**

341.   Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

342.   As a unique expression of both computer program commands and the sequence, structure, organization, and interface of a computer process, IGT's Encryption Source Code

1  constitutes intangible personal property over which IGT has a claim to exclusivity that it has

2  sought to protect by maintaining the secrecy of the code.

3      343.    Defendants have taken, transferred, copied, and/or retained the Encryption Source

4  Code.

5      344.    IGT is entitled to the return of the source code or, in the alternative, to damages for

6  taking and withholding the source code or for the value of LFG's use of the source code in an

7  amount to be proven at trial.

8                  **FORTIETH CAUSE OF ACTION**

9                           **Conversion**
                  **(Against All Defendants in the Alternative)**
10

11     345.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

12     346.    As a unique expression of both computer program commands and the sequence,

13  structure, organization, and interface of a computer process, IGT's Encryptions Source Code

14  constitutes intangible personal property over which IGT has a claim to exclusivity that it has

15  sought to protect by maintaining the secrecy of the code.

16     347.    By taking, transferring, copying, and using the Encryption Source Code without

17  IGT's consent, Defendants have wrongfully exerted dominion over IGT's intangible personal

18  property in denial, derogation, and defiance of IGT's rights to such property.

19     348.    As a result of Defendants' unlawful conduct, IGT has been damaged in an amount

20  to be proven at trial.

21                  **FORTY-FIRST CAUSE OF ACTION**

22                        **Unjust Enrichment**
                   **(Against LFG in the Alternative)**
23

24     349.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

25     350.    By copying IGT's Encryption Source Code, incorporating it verbatim into its own

26  products, and then marketing and selling those products, Defendant LFG has received (and

27  accordingly IGT has conferred) a benefit in the form of access (albeit unauthorized and unlawful)

28

to the BE2 Board and the value of the time and expense that LFG would otherwise have had to incur to develop the technology necessary to compete with IGT's sb NexGenII and BE2 Boards.

351.   Defendant LFG is aware of the benefit incurred upon it by IGT, as reflected in Defendant Saffari's admission recounted in Paragraph 70 that LFG possesses IGT's Encryption Source Code.

352.   Defendant LFG is also aware of the wrongful circumstances by which it came to possess the Encryption Source Code, in light of the numerous express contractual restrictions imposed on Defendants Saffari, Cobb, and Cunningham as recounted throughout the instant Complaint, including as specifically identified to LFG by letter from IGT dated January 20, 2015.

353.   In light of these wrongful circumstances, and LFG's express knowledge thereof, it would be inequitable for LFG to retain the benefit of its taking, possession, and use of IGT's Encryption Source Code without making payment for the value thereof.

354.   Defendant LFG has therefor been unjustly enriched by IGT, and IGT is accordingly entitled to payment in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment:

    a.   Permanently enjoining Defendants, pursuant to N.R.S. 600A.040, 15 U.S.C. § 1116(a), and/or 18 U.S.C. §1030(g), from using or disclosing IGT's Encryption Source Code, including through the sale or marketing of any device containing IGT's Encryption Source Code or any device that is otherwise designed to attach directly to IGT's BE2 Board and circumvent IGT's encryption technology;

    b.   Awarding Plaintiffs damages against Defendants, jointly and severally, for their misappropriation (or, in the alternative, their conversion) of IGT's Encryption Source Code, in an amount to be proven at trial;

    c.   Awarding Plaintiffs damages against LFG for its violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, in an amount to be proven at trial;

d.  Awarding Plaintiffs damages against the Individual Defendants, jointly and severally, for their violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, in an amount to be proven at trial;

e.  Awarding Plaintiffs damages against LFG for its violation of N.R.S. 205.4765 in an amount to be proven at trial;

f.  Awarding Plaintiffs damages against the Individual Defendants, jointly and severally, for their violation of N.R.S. 205.4765 in an amount to be proven at trial;

g.  Awarding Plaintiffs damages against LFG for its violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), in an amount to be proven at trial;

h.  Awarding Plaintiffs damages against Defendant Saffari for his violation of the April 10, 1990 Incentive Stock Option Agreement, the September 26, 1990 Incentive Stock Option Agreement, the May 5, 1995 Incentive Stock Option Agreement, the Second May 5, 1995 Agreement, the December 29, 1995 Incentive Stock Option Agreement, the December 17, 1996 Incentive Stock Option Agreement, the December 31, 1996 Incentive Stock Option Agreement, the December 17, 1997 Incentive Stock Option Agreement, the March 5, 1999 Incentive Stock Option Agreement, the March 5, 1999 Nonqualified Stock Option Agreement, the March 23, 2001 Nonqualified Stock Option Agreement, the December 31, 2001 Nonqualified Stock Option Agreement, the March 6, 2003 Nonqualified Stock Option Agreement, the March 26, 2003 Nonqualified Stock Option Agreement, the February 3, 2004 Nonqualified Stock Option Agreement, the December 31, 2004 Nonqualified Stock Option Agreement, the November 10, 2006 Nonqualified Stock Option Agreement, the May 11, 2007 Nonqualified Stock Option Agreement, and the July 16, 2009 Severance and General Release Agreement, in an amount to be proven at trial;

i.  Awarding Plaintiffs damages against Defendant Cobb for his violation of the January 7, 2004 Invention and Secrecy Agreement, the November 10, 2006

Restricted Stock Award Agreement, the November 10, 2006 Nonqualified Stock Award Agreement, the agreement created by Defendant Cobb's December 16, 2012 agreement to the terms and conditions of International Game Technology's award of stock, and the April 3, 2014 Severance and General Release Agreement, in an amount to be proven at trial;

j. Awarding Plaintiffs damages against Defendant Cunningham for his violation of the February 6, 2006 Incentive Stock Option Agreement, the agreement created by Defendant Cunningham's December 20, 2012 agreement to the terms and conditions of International Game Technology's award of stock, and the November 7, 2013 Severance and General Release Agreement in an amount to be proven at trial;

k. Awarding Plaintiffs damages against LFG for tortious interference with contract, in an amount to be proven at trial;

l. Awarding Plaintiffs damages against LFG for trespass to chattel, in an amount to be proven at trial;

m. Awarding Plaintiffs damages against LFG for unjust enrichment, in an amount to be proven at trial; and

n. Awarding Plaintiffs costs and attorneys fees as permitted by N.R.S. 205.511(1)(c) and pursuant the contracts between IGT and each of the Individual Defendants identified herein.

DATED:  September 24, 2015

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

By: _____

Richard I. Werder, Jr.
Thomas D. Pease
David Mader
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Dominic Gentile
Gentile Cristalli Miller Armeni & Savarese, PLLC
410 S. Rampart Blvd., Suite 420
Las Vegas, Nevada 89145
Telephone: (702) 880-0000
Facsimile: (702) 778-9709

*Attorneys for Plaintiffs International Game Technology and IGT*